No. 21-20555

# In the United States Court of Appeals for the Fifth Circuit

JOHN DOE,

*Plaintiff-Appellant,*

*v.*

WILLIAM MARSH RICE UNIVERSITY,
DOING BUSINESS AS RICE UNIVERSITY

*Defendant-Appellee.*

On Appeal from the United States District Court
For the Southern District of Texas, Houston Division

## BRIEF FOR APPELLANT

SUSAN E. HUTCHISON
Texas State Bar No. 10354100
Sehservice@FightsforRight.com

HUTCHISON & FOREMAN, PLLC
500 East 4th St., Ste. 100
Fort Worth, Texas 76102
Tel: (817) 336-5533
Fax: (817 887-5471                    COUNSEL FOR APPELLANT

CERTIFICATE OF INTERESTED PERSONS

No. **21-20555**

JOHN DOE

*Plaintiff-Appellant*,

*v.*

WILLIAM MARSH RICE UNIVERSITY,
doing business as RICE UNIVERSITY,

*Defendants-Appellees*.

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Appellant:
John Doe
Counsel for Appellant:
Susan E. Hutchison (Lead Counsel)
HUTCHISON & FOREMAN, PLLC

Appellee:
William Marsh Rice University dba Rice University
Counsel for Appellee:
Emily McLemore Smith
Rusty Hardin
Rusty Hardin & Associates

/s/Susan E. Hutchison
SUSAN E. HUTCHISON
Counsel of Record for Appellant

i

STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument because this case concerns a legal issue of national importance: what is equal treatment of men and women in a Title IX investigation by a university relating to a consensual student sexual encounter?

TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................................... i

STATEMENT REGARDING ORAL ARGUMENT.................................................... ii

TABLE OF CONTENTS............................................................................................iii

TABLE OF AUTHORITIES .....................................................................................iv

STATEMENT OF JURISDICTION............................................................................ 1

STATEMENT OF ISSUES PRESENTED................................................................... 1

    STATEMENT OF THE CASE............................................................................. 2

        1.    Effect of Defendant's Finding of Violation on John Doe.............................. 3

        2.    Investigation................................................................................................. 4

        3.    Suspension .................................................................................................. 22

        4.    Ramifications .............................................................................................. 24

        5.    Appeal ........................................................................................................ 27

        6.    Proceedings Below...................................................................................... 28

    SUMMARY OF THE ARGUMENT ................................................................ 28

    STANDARD OF REVIEW ............................................................................... 29

    ARGUMENT AND AUTHORITIES................................................................. 30

    1.  Title IX Provides a Remedy........................................................................ 30

        A.    Drawing all inferences in favor of Doe, the conclusion of the university was an erronoeous outcome ....................................................................................... 31

            i.    Roe's credibility issues are substantial: .......................................... 32

            ii.    The procedural flaws involved in the university's "investigation" are substantial: . ..................................................................................... 35

            iii.    The evidence of bias is also very substantial. ................................. 41

            iv.    Suspension: ...................................................................................... 44

        B.  Drawing all inferences in favor of Doe, the university engaged in selective enforcement............................................................................................ 47

        C.  Drawing all inferences in favor of Doe, the university engaged in archaic assumptions.............................................................................................. 49

            1.  Breach of Contract ............................................................................... 50

            2.  Damages................................................................................................ 51

    CONCLUSION.................................................................................................. 52

CERTIFICATE OF SERVICE ................................................................................. 53

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ....................................... 53

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................................... 30

*Burrell v. Crown Central Petroleum, Inc.*, 177 F.R.D. 376 (E.D. Tex. 1997) ............................ 52

*Doe v. Purdue Univ.*, 928 F.3d 652  (7th Cir. 2019), .................................................. 32

*Doe v. Univ. of Texas Health Sci. Ctr. at Houston*, No. CV H-21-1439, 2021 WL 5882625, at *9

  (S.D. Tex. Dec. 13, 2021). ....................................................................... 31

*Fisher v. Seton Family of Hosps.*, No. 1:18-CV-1108-RP, 2020 WL 2475823, at *2 (W.D. Tex.

  May 13, 2020)................................................................................... 52

*Klocke v. Univ. of Texas at Arlington,* 938 F.3d 204 (5th Cir. 2019) ........................................ 31

*Pederson v. Louisiana State Univ.,* 213 F.3d 858  (5th Cir. 2000)........................................... 49

*Southwell v. Univ. of Incarnate Word*, 974 S.W.2d 351 (Tex. App. 1998)................................... 50

*Williams v. Trader Publ'g, Co.*, 218 F.3d 481 (5th Cir. 2000) ............................................. 51

*Yusuf v. Vassar Coll.*, 35 F.3d 709  (2d Cir. 1994)................................................... 30, 31

**Statutes**

28 U.S.C. § 1331................................................................................. 1

28 U.S.C. § 1343................................................................................. 1

28 U.S.C. § 1367................................................................................. 1

Rules

Fed. R. Civ. P. 26................................................................................ 52

Fed. R. Civ. P. 56................................................................................ 30

## STATEMENT OF JURISDICTION

The district court had jurisdiction over plaintiff's Title IX claims under 28 U.S.C. §§ 1331 and 1343, as well as Plaintiff's state law breach of contract claims pursuant to 28 U.S.C. § 1367. The district court granted summary judgment to Defendant/Appellee. ROA.702-729. On September 16, 2021, the district court entered a final judgment against Plaintiff/Appellant. ROA.730. Plaintiff/Appellant timely filed a notice on October 14, 2021, appealing the summary judgment ruling. ROA.731-732. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED

Appellant Doe was a nineteen-year old freshman at Rice with a full ride football scholarship. He had a dating relationship with Roe, a 21 year old Junior female student during which they had voluntary, consensual sex. ROA.13. Prior to engaging in consensual sex, they had a discussion and exchanged information about their sexual histories, including the fact that Doe had contracted herpes in high school and had also previously contracted chlamydia. They broke up. ROA.13. Roe then filed a complaint alleging that Doe didn't tell her he had herpes and she had contracted the disease. ROA.13. The university kicked Doe off campus, refused to allow him to attend classes or football practice and, as a result, he lost his scholarship and his educational opportunity at Rice. ROA.15. Despite substantial evidence that the complainant was not credible and that Appellant had, indeed, disclosed to her

that he had previously contracted herpes, the district court found that there were no material fact issues on erroneous outcome, selective enforcement or archaic assumptions and no breach of contract. ROA.702-729.

The issues in this appeal are:

1) Whether there are material fact issues relating to the claim that the university's finding was an erroneous outcome

2) Whether there are material fact issues relating to gender bias on the part of the university

3) Whether there are material fact issues relating to the university's selective enforcement of its rules

4) Whether there are material fact issues relating to the university's archaic assumptions when addressing the Title IX claim

5) Whether any actions on the part of the university constituted a breach of contract

STATEMENT OF THE CASE

First and foremost, it is clear that John Doe told Jane Roe while they were dating that he had contracted herpes in high school: Defendant's Title IX investigator, Ms. Garza, admitted that Roe told her during the investigation that Doe had informed Roe he had herpes in high school. The following is an excerpt from Garza's initial "charge" letter to Doe: "[Roe] also told me that she recalls at one

point in your relationship there was a conversation about you having an outbreak of herpes. She told me that she believes you told her that it happened in high school." ROA.1609.

1. Effect of Defendant's Finding of Violation on John Doe

On February 2, 2017, John Doe proudly executed a National Letter of Intent, committing himself to enrollment at Rice University for football, and a Rice University Athletics Grant-in-Aid, which awarded him a 100% Athletics Grant-in-Aid (*i.e.*, a "full ride") for the 2017-2018 academic year. ROA.1600-1604. At the beginning of 2018, Ms. Roe asserted a Title IX claim against John Doe for allegedly giving her herpes during a consensual sexual relationship. Even though he was presumed innocent until the investigation of the allegations against him was complete, Mr. Doe was placed on suspension and kicked off campus. ROA.1474:17—1475:5. He could not attend class, live on campus, or be on campus for any purpose. ROA.1605-1606. He was threatened that if he was found on campus without permission, he would be removed and expelled. ROA.1605. Rice's action gave Mr. Doe, a nineteen-year-old freshman from another city, living on campus, less than twenty-four hours to pack up, leave campus and find another place to live. Doe told Rice he had nowhere to go. ROA.1576:17—25. Rice even knew it was putting Mr. Doe in danger. ROA.1575:11—18. Mr. Doe was not allowed to complete a class he needed to retain his scholarships status.

ROA.1574:12—19.  He was not initially allowed to continue with football activities.

ROA.1577:16—1578:7.   Mr. Doe ultimately was kicked out of football, lost his scholarship and had to withdraw from Rice.  ROA.1636-1638.   The tragic effect of the entire nightmare is set forth in his affidavit that is ROA.1635-1639.

## 2. Investigation

Emily Garza has been the Director of Student Judicial Programs since 2017 or 2018.  ROA.1421-1422.  She's one of the people tasked with enforcing Rice's Title IX policy, including investigating complaints of student sexual misconduct.  ROA.1423:6—1423:4.  Rice has never examined their Title IX practices to see whether there are patterns of findings related to gender.  ROA.1542:5—10.  Ms. Garza reported to Lisa DeLaTorre who reported to Donald Ostdiek, who had a supervisory role over the investigation of allegations of the Student Code of Conduct. ROA.1550:20—1551:2.

The policies that Garza implemented with respect to the manner of conducting the Title IX investigation were those made up by Rice University (such as not holding hearings or allowing the accused to have a lawyer communicate with the University).  ROA.1429:25—1430:16.

As the Title IX investigator, Ms. Garza agreed to all of the following:

Her investigation must be impartial, fair to both sides, thorough, assess all available evidence, demands interviewing all witnesses, reviewing all documents,

following up, objective weighing of the evidence, and applying a burden of proof. ROA.1424:5—1427:10   Ignoring relevant information or important information could show bias on the part of the investigator. ROA.1428:6—9. It is important for both sides to have an equal opportunity to present their case. ROA.1428:10—13.

Ms. Garza agreed that assessing credibility is an important part of her investigation. ROA.1431:4—21.  The investigator has to look for inconsistencies. ROA.1431:4-21.  If a student's story changes, goes back and forth, that could be an indication of lack of truthfulness. ROA.1431:4-21.  If the complaining student is not being truthful, that should call into question their complaint.  ROA.1431:4-21. Ms. Garza acknowledges that if she has a male and a female involved in a complaint of sexual misconduct, forgiving the female's inconsistencies more easily than the male's  would  violate  the  University's  gender  discrimination  policies. ROA.1432:4—19.  Ms. Garza agreed that if she was biased in favor of the female, it would violate the University's gender discrimination policies.  ROA.1432:4—19.

Mr. Doe and Ms. Roe began a romantic/sexual relationship while both students at Rice University in the fall of 2017.  John Doe was an incoming Freshman, and Ms. Roe was a three year college student.  ROA.1552:14—16, ROA.1581, ROA.1470:10—13.

They discussed their sexual histories then engaged in consensual, unprotected sex.  ROA.1582-1583.  They then broke up and after a last sexual encounter, Ms.

Roe filed criminal charges against Mr. Doe and a complaint with the University for contracting herpes HV-1. ROA.1595-1598, 1582, 1584.

The last night they slept together, Ms. Roe and Mr. Doe noted scabs on Ms. Roe's vagina. ROA.1491:1—5. The next day, Ms. Roe texted Mr. Doe about the condition, including information educating Mr. Doe about herpes. ROA.1585-1592. Ms. Roe attempted to press criminal charges against Mr. Doe and filed a complaint with Rice University (see documents referenced in timeline below).

Ms. Garza, conducting the investigation of Ms. Roe's complaint for Rice, considered the following information: a written statement from Ms. Roe, Mr. Doe's written response to the University's charge against him, text/snapchat messages between Ms. Roe and Mr. Doe, medical records of Ms. Roe, a University police report and her interviews of Ms. Roe and Mr. Doe. ROA.1443:4—1436:24. She alleges that she took notes during her interviews of the two students, but then destroyed them. ROA.1436:25—1438:4. At the time she destroyed her notes, she knew that Mr. Doe had retained an attorney in this matter. ROA.1436:25-1438:4.

Ms. Garza's investigation file does not reflect any research or investigation into the herpes disease. ROA.1439:13—17. At the time of her deposition, Ms. Garza could not distinguish between the two types of herpes. ROA.1440:7—20. She states that she did not think it was important for her to know that. ROA.1440:7-20. She admits, however, that wearing a condom is not going to prevent the

transmission of herpes if the students are engaged in oral sex. ROA.1441:19—22. She also admits that she was informed that the type of herpes Ms. Roe had (HV-1) could present as a cold sore. ROA.1500:10—14. When Ms. Roe presented the lab results for HV-1, Ms. Garza did not ask Ms. Roe how she was tested or how it was determined to be genital. ROA.1501:10—1503:17. She understands that HV-1 can be a simple cold sore. ROA.1502:6—9. She did not ask Ms. Roe if she had ever had a cold sore or had sex with anyone who had a cold sore. ROA.1503:8—20. Ms. Garza has no idea whether someone who has a cold sore would test positive for HV-1. ROA.1504:21—1505:1. In fact Ms. Garza testified "I'm not a doctor, and so I'm not gonna get into the ins and—ins and outs of how HSV-1 is transmitted orally or genitally." ROA.1501:24—1506:1. She did not feel the need to educate herself about that before making the findings against Mr. Doe. ROA.1506:2—8.

Q: Does a student with a cold sore have to inform their sexual partners at Rice that they have HSV-1, and it's a lifelong, permanent condition that could be transmitted?
....
A: That is a fact situation that I have not investigated or adjudicated, so I do not know what the outcome of that investigation would be." ROA.1507:7—19.

Ms. Garza cannot comment whether such would violate the student code of conduct. ROA.1510:1—19

Ms. Garza claims that she was not investigating whether or not Ms. Roe contracted herpes from Mr. Doe. ROA.1443:9—15. It was not part of her investigation as to whether or not Mr. Roe actually contracted herpes from Mr. Doe.

7

ROA.1443:16—1444:7. Ms. Garza testified that it did not matter to her whether or not Ms. Roe was lying about where she got herpes. ROA.1444:8—11. She alleged that allowing the female to lie about where/how she contracted herpes does not show any bias on her part. ROA.1444:12—16. The fact that Ms. Roe lied about Mr. Doe being the only person she slept with and then changed her story was "not relevant to the decision in the case." ROA.1445:2—11. That was not the only thing Ms. Roe lied about:

Q:   So when—I'm a little unclear where we ended up on this issue because Ms. [Roe] changed her story a number of times about whether he [Mr. Doe] told her that he had herpes in high school, didn't she?

A:   Yes

ROA.1445:12—17

There are numerous documented instances where Ms. Roe said she never even asked Mr. Doe about herpes before they slept together. There are also numerous instances where Ms. Roe said she did ask Mr. Doe about it before they slept together and he admitted he had it in high school. Ms. Garza acknowledges in her deposition repeated misrepresentations by Ms. Roe during this report and investigation, including: Ms. Roe misrepresenting on at least three occasions that Doe did not tell her that he had herpes before they slept together (ROA.1465:11-1466:8); whether Ms. Roe and Mr. Doe had sex after she discovered scabs on her vagina (ROA.1466:9—1468:12); whether Ms. Roe had been getting screened for herpes

8

before sleeping with Mr. Doe (ROA.1468:13—16); Ms. Roe omitting from police reports that Mr. Doe had told her before they had sex that he had herpes in high school (and Roe's completely unbelievable explanation) (ROA.1495:12—1498:10)

Ms. Garza admits in her deposition that Ms. Roe did tell her that before having sex, Mr. Doe "disclosed to [Roe]" that he had a "run in with herpes" in high school. ROA.1435:18—25.    And at that point, Roe was a consenting adult female. ROA.1446:1—7.   Yet Ms. Garza believed that upon hearing from Mr. Doe that he had herpes in high school, Ms. Roe had no obligation to ascertain the ramifications of that.   ROA.1446:21—1447:3.   Ms. Garza blames Doe for not having a better understanding of the permanence of herpes.  ROA.1447:4—25.  Ms. Garza blames Mr. Doe for telling Ms. Roe that he had herpes in high school but believed he was "clean."   ROA.1448:15—1451:5.   However, Ms. Garza simply considered Roe's interpretation of the comment without even asking—ever—Doe what he meant. ROA.1448:15-1451:5.

Fall 2017    ROA.1582 and ROA.1585-1592  Ms. Roe and Mr. Doe began a consensual sexual relationship.  They discussed their sexual histories first and Mr. Doe told Ms. Roe that he had previously had chlamydia and that he had herpes in high school.  They both then engaged in consensual, unprotected sex.

12/13/17    Ms. Roe and Mr. Doe began to engage in sexual contact, notice bumps or scabs on Ms. Roe's vagina and continue sexual contact anally, using a

condom.  Ms. Roe does not discuss the bumps with Mr. Doe or ask him any questions

about it because she "didn't find it necessary at the time."  ROA.1498:12—1499:8.

12/14/17    ROA.1585-1592 is a text exchange between Ms. Roe and Mr.

Doe the next day.

Roe: "[a]bout the bumps and shit and I think it's herpes...and there's no possible
way I could've gotten it from anyone else but you.  And you did mention to me
that you had a run-in senior year maybe?...I most likely got it from u, which means
u have dormant herpes."
Doe (who is home visiting with his mother): "[s]orry Im busy with my mom.  And
I think it's that too, just looks similar.  But yeah I had it a long time ago. And what
does dormant mean.  Would you be comfortable showing me what it looks like?"
Roe: "Once u have herpes you have it for life, you know that right it never goes
away.  Ever there's not a cure" "So you know you've had herpes this entire time
and you didn't tell me until now."  **[NOTE: this statement is not true as
demonstrated both by her own text saying "you did mention to me that you
had a run-in senior year" and also repeatedly documented during the
investigation, including in Ms. Roe's statement ROA.1582**
Doe: "Yes"
Roe: "Why [John] Why You gave it to me Why [John]"
Doe: "In all honesty I didn't think about that.  I'm apologize.  All I can say is that.
And words won't help on my side."
Roe: "Question: are you aware of how much you fucked up.  I don't think you do.
But you will, do not worry.  You don't fuck w me like that and get away with it
[John], no matter how pretty you are"
Doe: "Look, I never did anything on purpose to hurt you.  My intentions were to
not hurt you.  I apologize for what happened."
Roe: "Oh but you did.  You did.  It is illegal to not tell the person you're sleeping
with that you have a serious and LIFE CHANGING STD.  You know"  (text cuts
off)

12/18/17    ROA.1593 is Ms. Roe's submission to the University police.

Nowhere in that submission does Ms. Roe tell the police that Mr. Doe had told her

10

before they slept together that he had herpes in high school. Ms. Garza was aware of this. ROA.1452:4—8.

12/18/17    ROA.1594-1598 is the Rice University Incident Report, reflecting that Ms. Roe told the investigator that she asked Mr. Doe about chlamydia but she did not talk to Mr. Doe about any other STD's. ROA.1452:23—1453:1.

Ms. Roe also told the police that after she discovered she had herpes, she believed it was from Mr. Doe because she had not "been" with anyone else since "her last physical in August." However, if you compare that to her statement in ROA.1593, she says there that she has "only hooked up with two people in the last six months." Ms. Garza did not ask Ms. Roe who the other person she had been sleeping was or whether they had an STD. ROA.1457:20—25.

Ms. Roe also told the police in this statement that in the beginning, when she and Mr. Doe first started dating, she asked him about a rumor that he had chlamydia and he told her no, he was clean. ROA.1458:5—11. Yet when interviewed by Ms. Garza, Ms. Roe yet again changed her story and said that Mr. Doe told Ms. Roe before they slept together that he had contracted chlamydia. ROA.1459:8—15. Ms. Roe also admits in her statement ROA.1582-1583 that Mr. Doe told her that he had chlamydia previously. ROA.1460:8—15.

Ms. Roe also told the police in this report that every six months she gets a physical exam and tests to assure she is clean of STD's. ROA.1463:6—12. This

11

was another lie by Ms. Roe, known to Ms. Garza. ROA.1464:5—7, 1465:3—20. Ms. Garza has never seen any test result of any test on Ms. Roe saying she did not have an STD. ROA.1464:1—4. In fact, she never even asked Ms. Roe to see the allegedly STD screens. ROA.1466:1—3. It is noteworthy that Ms. Garza attributed total innocence to Ms. Roe about the attributes of herpes and never wondered why Ms. Roe claimed to be getting screened for it. ROA.1469:2—10.

2/5/18    RUPD ROA.1594-1598 reflects that the Harris County DA (to whom Ms. Roe had also gone to press criminal charges) informed the RUPD that Harris County would not be pressing criminal charges.

2/12/18    ROA.1582-1583 is Ms. Roe's "Official Statement" to the student judicial program against Mr. Doe. In this statement Ms. Roe states "I did not specifically ask about herpes but asked him in general if he had anything." Ms. Garza acknowledges Ms. Roe's repeated statements that she, Ms. Roe, did not ask Mr. Doe about herpes before they slept together. ROA.1453:18—1454:8.

Ms. Roe also said in the statement "[t]hat night, when he had my pants off, he told me he saw bumps on my vagina and advised going to get it checked out tomorrow. That night he refused to have sex with me because of the scabs he saw." This is yet another statement by Ms. Roe that was a lie. ROA.1461:3—19. When Ms. Garza interviewed Mr. Doe about that night, he is the one that told the truth about it—that Ms. Roe and Mr. Doe agreed to alternatively have anal sex that night

12

with a condom.  ROA.1461:23—1462:5.   It was only after Ms. Garza confronted Ms. Roe with the true information from Mr. Doe that Ms. Roe confessed to the truth. ROA.1462:6—13.  Ms. Garza did not even question Ms. Roe about why Ms. Roe did not ask Mr. Doe what the scabs were or what he knew about them, but admits that Ms. Roe did not do so.  ROA.1492:3—11.  In fact, Ms. Roe stated that she did "not find it necessary" to ask Mr. Doe about the scabs.  ROA.1498:18—20.

2/12/18        ROA.1581 Ms. Roe provided a written "addendum" to her statement, in which she clarifies that she has "slept with a good amount of people here at Rice throughout my three years."  She also says that "[Doe] was not the first person I had unprotected sex with."  Ms. Garza did not ask Ms. Roe how many other students she had unprotected sex with, did not ask for any names, took no steps to interview any other students and did not even consider interviewing the other student that Ms. Roe was sleeping with at the same time she was sleeping with Mr. Doe. ROA.1471:3—19.

2/13/18        ROA.1599 is an email from Ms. Garza to Mr. Doe (1:44 pm) where she tells him (for the first time) that there is a meeting scheduled regarding a "disciplinary matter" for 11 am the next day.

2/14/18        ROA.1607 Mr. Doe responds at 10 am to Ms. Garza's 2/13 email by saying "I would like to reschedule this meeting so I can get some legal advice and be more prepared...I'm just not sure what my rights are and I don't want to do

anything wrong. Could you please give me a week or so to get my situation in order."

**Ms. Garza's email response**, 10:52 am: "Someone from Rice will be in contact with you shortly regarding rescheduling our meeting and the next steps in the process."

2/14/18      ROA.1608-1611 sent by email at 2:06 pm is the Notice of Disciplinary Charge prepared by Ms. Garza against Mr. Doe. He is charged with "DATING VIOLENCE."

On page, 2, third paragraph, Ms. Garza states "[Roe] also told me that she recalls at one point in your relationship there was a conversation about having an outbreak of herpes. She told me that she believes you told her it happened in high school." Ms. Garza had at this time the university police report and Roe's statement—all of which directly contradict what Ms. Roe told Ms. Garza as reflected above. ROA.1455:2—12. Even with those documents in hand, Ms. Garza did not ask Ms. Roe about the glaring and obvious inconsistencies of her story before creating a disciplinary Charge against Mr. Doe. ROA.1455:2—1456:1.

In a later interview of Ms. Roe, when the inconsistencies were pointed out, Ms. Roe said that she had a "fuzzy memory." ROA.1456:5—16. That "fuzzy memory" somehow morphed into a totally new story between Ms. Roe's statement to the police to her statement to Ms. Garza. ROA.1456:13—16.

When Ms. Roe filed the criminal charges, she alleges she did not remember that Mr. Doe had used the word "herpes" when he told her he had it senior year of high school. ROA.1493:10—13. Ms. Garza found that "explanation" by Ms. Roe of the omission of such information to the police to be credible. ROA.1470:10—15. Ms. Roe's memory was "fuzzy." Ms. Garza admits that on 12/14/17, Ms. Roe confirmed that Mr. Doe told her he had herpes his senior year in high school. ROA.1494:4—7. It was four days later that Ms. Roe filed a police report where she does not tell the police that Mr. Doe gave her that information before they had sex. Ms. Garza didn't even ask Ms. Roe how she could lose her memory in four days. ROA.1495:12—1497:4. However, Ms. Garza concluded that memory loss was a reasonable explanation by Ms. Roe for remembering on 12/14 but not on 12/18 what Doe had told her. ROA.1495:12—1498:7.

2/14/18    ROA.1605-1606 is a letter sent by Ostdiek to Mr. Doe placing Doe on interim suspension "effective immediately." "You cannot attend class, live on campus, or be on campus for any purpose without the express permission of me, or Student Judicial Programs."..." If you are found on campus without this permission, you can expect to be removed from campus and face charges that can lead to permanent expulsion from the University."

This letter from Ostdiek gave Doe, a nineteen-year-old freshman from another city, living on campus, less than twenty-four hours to pack up, leave campus and find another place to live.

2/19/18      ROA.1612 is an email from Ms. Roe to Cathryn Councill saying that she, Roe, is suspicious that Mr. Doe is going to football workouts because she has been talking to Mr. Doe's teammates.   Ms. Garza had no concerns with the fact that Ms. Roe was taking steps to talk to Mr. Doe' teammates and track his activities. ROA.1476:1—6.

Ms. Councill responded by stating that she would speak with Allison Vogt, the Director of Sexual Violence Prevention and Title IX Support.  ROA.1479:20—1480:10.

3/6/18      ROA.1613-1616 is the statement of Mr. Doe.

3/15/18      ROA.1617-1619 is a "rebuttal" by Ms. Roe.  Once AGAIN, Ms. Roe reverses course on what information she got from Mr. Doe and says "he did not tell me that he had herpes until now, on December 14th.  Therefore, his claim that he clearly told me about his disease early on in the relationship is false."   Ms. Garza herself acknowledges that Ms. Roe is once again being inconsistent and "doing two different things at one time in this statement."  ROA.1521:3—10.

4/17/18      ROA.1620-1621 Ms. Garza finds Doe guilty of a "reckless act from which mental or bodily harm could result to another person."   She does not

16

acknowledge anywhere that Doe did not understand that herpes could be "dormant" as he stated in his text messages at ROA.1585-1592.

5/4/18    ROA.1622-1623 is an email from Ms. Roe to various Rice University officials during the appeal process in which Ms. Roe responded to Mr. Doe putting  the school on notice that Ms. Roe had told others that it was her intention to keep her infection a secret and not tell her sexual partners.  In response, Ms. Roe stated "I have talked with multiple doctors who have confirmed that many people use protection without necessarily explaining their condition in cases that may be uncomfortable to do so."

4.    University Finding

Ms. Garza found that Mr. Doe violated the Student Code of Conduct, Section IIB1a.

Ms. Garza is not alleging that Mr. Doe withheld information that he was aware of. ROA.1508:23—1510:14.   Yet her decision was that Mr. Doe had an obligation "to inform his partner that he had a sexually transmitted disease that could be passed along to another partner if he had unprotected sex with them." ROA.1511:3—14. There is no coherent answer as to how Mr. Doe would be expected to "inform" someone of something of which he was not aware. ROA.1510:19—1511:2.   Ms. Garza focused on the allegation by Ms. Roe that Mr. Doe said he had herpes in high school but was "clean." ROA.1511:18—1512:18.  She is not aware of what Mr. Doe

meant by "clean" and she is not interested in knowing what he meant. ROA.1512:2—18.   She acknowledged that Doe said in his statement "I definitely have not had any outbreaks or symptoms since the incident in high school with the burning when I urinated.  <u>I would never have exposed anyone if I thought I could spread the disease</u>."   ROA.1511-1514 (emphasis added) and that he did not understand that it could be "dormant."  ROA.1585-1592.  However, she refused to state what that statement meant in the context of her investigation.  ROA.1513:18—1518:16.

Ms. Garza formed the belief that Ms. Roe was "unaware" of the nature of the lifelong condition (herpes) and that "you are a carrier for life."  ROA.1472:17—24.  Yet in Ms. Roe's text to Mr. Doe on 12/14/17, she stated "you did tell me you had a run-in senior year." ROA.1624-1627.   Ms. Garza admits that the day after Roe showed symptoms, she seemed to have quite a bit of information about herpes.  ROA.1481:19—22.  She also admits that she does not know whether Ms. Roe had such knowledge at the time Ms. Roe and Mr. Doe slept together.  ROA.1481:19—25.

Q:    If she's having all of these conversations as she indicated in this email [ROA.1581] to her good amount of sexual partners where she's having unprotected sex before she encountered [Doe], and she's talking to them about whether they're clean or not clean, do you believe that indicates a level of awareness on her part about sexually transmitted disease?

A:    I would have no way of knowing that
ROA.1473:1—9

Ms. Garza did not believe the level of Ms. Roe's knowledge of sexually transmitted diseases was "relevant." ROA.1473:10—14, 1474:10—16. Ms. Garza testified that she did not need to know whether or not Roe was fully informed about herpes before she slept with Doe. ROA.1490:19—22.

Ms. Garza acknowledged that if Ms. Roe was also a carrier of an STD that could be transmitted through sexual intercourse and she was aware of that, she would be obligated to inform Mr. Doe. ROA.1482:25—1483:11. Mr. Doe told Ms. Garza that he had information and belief that Ms. Roe had herpes before she ever met Doe, even supplying the name of a witness to verify such. ROA.1483:12—25. Ms. Garza made the conscious decision not to talk to the witness. ROA.1483:12-25. Because Ms. Roe denied she had been a carrier of an STD, Ms. Garza took her at her word and did not bother to interview Mr. Doe' witness. ROA.1484:1—1485:21. When asked whether, in order to fair and balanced, she would need to investigate the behavior of both Ms. Roe and Mr. Doe, Ms. Garza stated that she did not investigate Ms. Roe's behavior because she did not "have a report about Ms. Roe not upholding her obligation" under the circumstances. ROA.1485:21—1486:1. When asked whether that was something Mr. Doe asked her to do, Ms. Garza said "no." ROA.1485:21—1486:4. However, if you look at Mr. Doe' written statement (ROA.1613-1616), Mr. Doe states that Ms. Roe gave another student herpes before she slept with Mr. Doe. He provided the name of the other student that Ms. Roe

19

gave herpes to (before she slept with Mr. Doe) and said that student had given permission for the University to speak to him. ROA.1614. Here is a written complaint about Ms. Roe's behavior in failing to reveal to Mr. Doe her condition and Ms. Garza stated that she did not need to investigate it. ROA.1487:13—1489:1. So while Ms. Garza did not find it relevant as to whether Ms. Roe already had herpes (and had passed it on to an unsuspecting male student), she did find "relevant" a gynecological record of Ms. Roe that showed simply on one random date in July, Ms. Roe was not having visible symptoms of herpes. ROA.1522:1—1525:23.

Ms. Garza admits that she could not recall any misrepresentation made by Mr. Doe during the investigation. ROA.1519:6—25. She admits that at least two of the things that Mr. Doe was forthcoming about, Ms. Roe misrepresented. ROA.1520:8—15. She admits that while Roe alleges in her rebuttal [ROA.1628-1630] that Doe "hid" his condition, Roe herself told the university (including Ms. Garza) in an email [ROA.1622-1623] of her intent to have sex with people (including presumably other Rice students) without informing them of her herpes because she would use a condom. ROA.1530:7—14. Ms. Garza testified that she was "incapable" of making the determination as to whether Ms. Roe's stated intent violated the Student Code of Conduct. ROA.1531:17—21. She did not ask Ms. Roe to educate herself sufficiently to inform her sexual partners accurately. ROA.1532:4—7. None of the recipients of the email even discussed whether Ms.

Roe's stated intent posed a danger to the other Rice students. ROA.1532:8—20. Ms. Garza testified that she had no ability to have an opinion about whether Ms. Roe's intended conduct (arguably worse than Mr. Doe) would violate the Student Code of Conduct. ROA.1540:8—1541:2. Mr. Ostdiek testified that if he became aware of expressions of intent such as Ms. Roe's to sleep around and not inform her partners that she had herpes, he would want her "counseled" because "this is a very troubling time with a lot of life-changing decisions she has to make." ROA.1553:3—1555:7.

Ms. Garza acknowledged that Roe had a number of options when Doe told her he previously had herpes: she could have abstained, but chose instead consensual sex; she could have insisted they both get tested but did not do that; she could have insisted that Mr. Doe get tested before sex but she chose not to do that; she could have educated herself about herpes before having sex but chose not to do that. All were choices rejected by Roe in favor of going forward with sexual intercourse. ROA.1527:2—1529:2.

Doe was not allowed to have his attorney participate in the process. ROA.1539:4—12. He was assigned a Title IX "resource navigator" to act as a support and a resource during the disciplinary process. ROA.1533:1—1534:4. Doe was assigned to Allison Vogt as his resource navigator. ROA.1534:17—20. ROA.1631-1632 is an email from Ms. Vogt to Ms. Garza and others in Dec. 19,

2017 stating that she, Ms. Vogt, met with Roe and the police so that Ms. Roe could make her criminal charges and discusses the criminal implications of giving someone a sexually transmitted disease.  It was after that when Ms. Vogt contacted Doe about being his "resource." ROA.1633

The Student Code of Conduct also states that failing to be honest is a violation. ROA.1552:4—6.  Giving false information during an investigation in the student judicial program is also a violation of the Code of Conduct.  ROA.1552:7—11.  Ms. Roe clearly violated these provisions and suffered no consequences whatsoever.

3. Suspension

Suspensions were within Mr. Ostdiek's discretion.  ROA.1556:17—25.  Even interim suspensions could have severe consequences for a student.  ROA.1556:23-25.  He is supposed to take into consideration just discipline, not unduly interfering with the student's rights to an education.  ROA.1557:16—25.

Mr. Ostdiek acknowledged that at no time did Doe refuse to provide information. ROA.1564:21—23.  After Doe sent an email saying he was concerned, wanted legal consultation and asked to reschedule, no one at the school told him it was a problem to reschedule the meeting.  ROA.1564:24—1566:5.

Despite the facts that Doe did not refuse to cooperate, did not refuse to meet, responded to the school's emails, asked for and RECEIVED an extension on the

meeting, and acted reasonably under the circumstances, he was suspended from school, ROA.1605-1606.

Q:    Well, did you, yourself ever try to reach out to [Doe] and talk to him, email him, ask him if he would provide information, anything at all before you suspended him?

A:    I don't recall that I did, no.    ROA.1568:4—8.

Indeed, Mr. Ostdiek never even spoke to Ms. Roe about Doe before suspending Doe and kicking him off campus. ROA.1569:7—13.    Mr. Ostdiek's letter of suspension does not even reference an allegation that Doe failed to disclose information. ROA.1571:8—1572:8.

ROA.1605-1606 is a letter sent by Ostdiek to Doe placing Doe on interim suspension "effective immediately."  "You cannot attend class, live on campus, or be on campus for any purpose without the express permission of me, or Student Judicial Programs."... If you are found on campus without this permission, you can expect to be removed from campus and face charges that can lead to permanent expulsion from the University."

This letter from Ostdiek gave Doe, a nineteen-year-old freshman from another city, living on campus, less than twenty-four hours to pack up, leave campus and find another place to live.

Mr. Ostdiek states in the letter that one of the reasons for such harsh penalty was that there was no indication that Doe was going to change his behavior going forward. ROA.1567:2—5. Yet Mr. Ostdiek had absolutely no communications with Doe before he, Mr. Ostdiek, formed that conclusion and wrote that letter. ROA.1567:6—11. In fact, Mr. Ostdiek's information at the time of the unilateral suspension was that Ms. Roe had engaged in voluntary, consensual, sexual intercourse. ROA.1570:14—23.

Mr. Ostdiek concluded that Doe had to be suspended because of an alleged risk to other students without informing himself as to the specifics of how herpes was spread and without even knowing what type of herpes either Mr. Doe or Ms. Roe had or even whether it was the type of common cold sores. ROA.1558:1—1560:9.

At the time that Mr. Ostdiek suspended Doe, he did not even inform himself whether Doe had anywhere to go or transportation to get there. ROA.1560:23—1561:4. He did not take any steps to inform himself of what effect the interim suspension would have on Doe's football scholarship. ROA.1561:5—10.

4.   Ramifications

The consequences of putting Mr. Doe on interim suspension on 2/14/18? Doe would have to make arrangements for a different place to live and how to attend classes. ROA.1572:9—19. He would have to move out within 24 hours.

24

ROA.1573:1—7. When asked where Doe would be able to move into under those circumstances, Mr. Ostdiek stated "[t]hat's for him to figure out." ROA.1573:5—9. Ostdiek acknowledges that kicking a student off campus without knowing whether they have a place to stay or any transportation or anywhere safe to go potentially puts that student in danger. ROA.1575:11—18.

At the time, not all classes could be completed remotely. ROA.1574:2—6. For the classes that Doe was not able to complete remotely, he would not receive credit. For example, Doe's history professor contacted Mr. Ostdiek and stated that Doe would not be allowed to complete the class remotely and would be forced to drop the class. ROA.1574:12—19.

Ms. Garza never checked on what the ramifications to Mr. Doe would be from her findings. ROA.1502:2—5.

Ms. Garza testified that Doe was suspended because "he was unresponsive with requests from RUPD and that he was unresponsive when we requested to have a meeting with him." ROA.1476:7—11, which is contradicted by the emails referenced above.

As far as the RUPD, Ms. Garza has no information about any alleged refusal of Doe to respond to the RUPD. ROA.1535:4—1536:4. She testified it was not her job to know. ROA.1535:4-1536:4.

25

Ms. Garza acknowledges that Roe was trying to press criminal charges against Doe. ROA.1477:22—24. Ms. Garza acknowledges that since criminal charges could conceivably involve jail time, it should not be held against Doe if he wanted to consult with an attorney before giving a statement. ROA.1478:6—13, 1536:9—13. There was no discussion between Ms. Garza and Mr. Ostdiek about the reasonableness of Doe's actions before he was suspended. ROA.1536:14—21. However, even Mr. Ostdiek acknowledges the reasonableness of every citizen's constitutional right to legal counsel when faced with criminal charges. ROA.1562:22—1563:8.

As far as the allegation that Doe was unresponsive to the school's request for a meeting, Ms. Garza sent Doe an email on February 13, 2018 at 1:44 p.m. ROA.1599. The email set a meeting for the following day, the date on which Mr. Doe was supposed to respond, and yet Doe was suspended before the meeting was even to take place. ROA.1477:3—11. Ms. Garza did not try and call Doe, did not text him, and has no idea when Doe received her email scheduling a meeting for the following day. ROA.1537:12—1538:7. She admits she cannot testify that Doe received her email and ignored it. ROA.1537:12-1538:7. After receiving Ms. Garza's email, Doe asked for an extension of the meeting date, and Ms. Garza agreed that was a reasonable request. ROA.1538:8—22.

Prior to the decision letter, Ms. Garza had a conversation with Mr. Ostdiek about "appropriate penalties" and "what would be reasonable and customizable for [Doe's] particular set of circumstances." ROA.1543:12—20. Ms. Garza claims they assessed "[w]hat penalties would allow [Doe] to continue to pursue his education at Rice while protecting the reporting student in this case and the greater community." ROA.1543:21—25. The "greater community" being "everybody else that is a student that lives—or that lives or attends Rice University." ROA.1544:1—3. However, no other students had complained about Doe. ROA.1544:4—6. So even though no other students had complained about Doe, they felt free to protect those students, yet when Ms. Roe directly threatened to sleep with Rice students and not tell them she had herpes, they were unwilling to protect those students. ROA.1544:19—1545:22.

5.   Appeal

Even though Doe's attorney timely filed the appropriate request for an appeal of the suspension, Rice (after the deadline passed) then informed Doe that they would not accept the notice filed by his lawyer and he was not allowed to appeal. ROA.1546:7—13. Ms. Garza could not point to any school policy, procedure or Title IX policy or law that says a lawyer cannot submit an appeal for a student. ROA.1546:14—17. It is very clear that Rice intentionally waited until after the

27

deadline passed before informing Doe and his attorney that they would not accept the attorney's appeal and it was now too late for Doe to file one. ROA.1634

6. Proceedings Below

On September 11, 2019, Appellant filed a Title IX suit in the Eastern District of Texas. ROA.12-44. The university filed a Motion to Dismiss for Improper Venue or Alternatively to Transfer Venue, and to Dismiss for Failure to State a Claim on December 11, 2019. ROA.79-107. On August 4, 2020, the district court granted a transfer of venue and the case was transferred to the Houston Division of the Southern District of Texas. ROA.340-352. Rice University filed a Motion for Summary Judgment on January 16, 2021. ROA.454-471. The Motion for Summary Judgment was granted by Memorandum Opinion on September 16, 2021. ROA.702-729.

SUMMARY OF THE ARGUMENT

Doe was a freshman in college. Roe was a junior, several years older than Doe. They dated and had consensual sex. They broke up. Roe then made a Title IX complaint that Doe gave her herpes (her story about whether he had told her he had contracted herpes in high school kept changing). The university acknowledged in its charge letter that Doe informed Roe while they were dating that he had contracted herpes in high school, yet the university "found" that Doe "failed to adequately notify [Roe] of the fact that she was at risk of contracting SHV-1 from you if the two

of you engaged in unprotected sex." There are a multiple problems with this "finding." The university admits that herpes can be transmitted even when protection is used. The uncontradicted evidence further establishes that Doe was not aware that dormant herpes could be contagious. Roe admitted to sleeping around a lot with other university students before Doe. She was savvy enough to allegedly be getting monthly tests for std's. Thus, the finding that Doe failed to disclose information to Roe is totally unsupported. Further, the university admitted that Roe continuously misrepresented important information (such as whether Doe had informed her he had contracted herpes in high school) and Doe did not misrepresent information. The blatant gender bias with which Doe was treated is evident in each action taken by the university. The evidence at the very least raises material fact issues as to whether there was an erroneous outcome of the investigation, whether the university engaged in selective enforcement of its policies and whether the university engaged in archaic assumptions with respect to its investigation and findings. Finally, there are at least material fact issues as to whether Rice, as a private university, breached its contract with Doe.

STANDARD OF REVIEW

This court reviews the district court's grant of summary judgment to defendant de novo and should affirm only if, viewing all evidence in the light most favorable to Appellant, there are no material fact issues and Appellee is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

ARGUMENT AND AUTHORITIES

1. Title IX Provides a Remedy

Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  In the instant case, Doe asserted claims under Title IX pursuant to the erroneous outcome of the investigation, selective enforcement of policies by the university and archaic assumptions throughout the process.

Much of the district court's opinion in the instant case is based upon a single word in a confusing text exchange between Doe and Roe while Doe was home and with his mother, that is subsequently given context and explained by further information and statements, as described below. Mem. Op. ROA.718.  Such reliance fails to view all of the additional substantial and explanatory evidence provided by Doe in the light most favorable to Doe and takes the conversation out of context, as further explained below.  Additionally, the district court's findings regarding Doe's participation in the process, particularly with respect to the suspension, fail to view the evidence in the light most favorable to Doe, as explained in detail below.[1]

---

[1] The district court opinion alleges that Doe failed to cite to the record for his assertions.  Mem. Op. ROA.714.  The court cites to several cases stating that the court is not required to "sift through the record" in search of evidence.  *Id.*  However, in the cases cited by the court, the referenced party failed to point out the evidence in their briefs.  In the instant case, Doe provided twenty pages of specifically cited and referenced facts.  Some of those facts were summarized in the legal analysis; however, all facts summarized were specifically cited and referenced in the factual portion of the brief.

A. Drawing all inferences in favor of Doe, the conclusion of the university was an erroneous outcome.

A plaintiff alleging an erroneous outcome may point to "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding ... based on the record before the disciplinary tribunal. *Klocke v. Univ. of Texas at Arlington,* 938 F.3d 204, 210 (5th Cir. 2019) (emphasis in original) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). For example, he may allege that the complaint or witnesses had a motive to lie or that his defenses had particular prevailing strengths. *Yusuf*, 35 F.3d at 715. The plaintiff must also show a "causal connection between the flawed outcome and gender bias." *Klocke*, 938 F.3d at 210. In a suit for damages, the plaintiff must show that the school's response was "clearly unreasonable in light of the known circumstances." *Doe v. Univ. of Texas Health Sci. Ctr. at Houston*, No. CV H-21-1439, 2021 WL 5882625, at *9 (S.D. Tex. Dec. 13, 2021).

Violations of Title IX occur when there are evidentiary weaknesses behind the finding of an offense such as credibility issues with the complainant, particularized strengths of the defense "or other reason to doubt the veracity of the charge." *Yusuf*, 35 F.3d at 715. A cause of action "may also allege particular procedural flaws affecting the proof." *Id*. Violations are also established by "statements reflecting bias by members of the tribunal," which "suffice both to cast

31

doubt on the accuracy of the disciplinary adjudication and to relate the error to gender bias." *Id*.

In *Doe v. Purdue Univ.*, 928 F.3d 652, 656 (7th Cir. 2019), a case very similar to the instant case, the court found that Doe provided evidence of Title IX violations in part because of a failure to consider "Jane's" credibility. In that case, John Doe identified specific impeachment evidence to the university advisory committee that was not considered, supporting a claim of bias on the part of the committee. *Id*. at 669.

      i.     Roe's credibility issues are substantial:

Ms. Garza acknowledged in her deposition repeated misrepresentations by Ms. Roe during the investigation, including: Roe misrepresenting on at least three occasions that Doe did not tell her that he had herpes before they slept together (ROA.1465:11-1466:8); whether Ms. Roe and Mr. Doe had sex after she discovered scabs on her vagina (ROA.1466:9—1468:12); whether Ms. Roe had been getting screened for herpes before sleeping with Mr. Doe (ROA.1468:13—16); Ms. Roe omitting from police reports that Mr. Doe had told her before they had sex that he had herpes in high school (and Roe's completely unbelievable explanation) (ROA.1495:12—1498:10). Ms. Garza admits in her deposition that Ms. Roe did tell her that <u>before</u> having sex, Doe "disclosed to [Roe]" that he had a "run in with herpes" in high school. ROA.1435:18—25. In fact, before engaging in consensual

sexual intercourse, Doe and Roe discussed their sexual histories first and Mr. Doe told Ms. Roe that he had previously had chlamydia and that he had herpes in high school. ROA 1582, 1585-1592.

ROA.1593 is Roe's submission to the University police. Nowhere in that submission does Roe tell the police that Doe had told her before they slept together that he had herpes in high school. Ms. Garza was aware of this during her investigation. ROA.1452:4—8.

ROA.1594-1598 is the Rice University Incident Report, reflecting that Ms. Roe told the investigator that she asked Mr. Doe about chlamydia but she did not talk to Mr. Doe about any other STD's. ROA.1452:23—1453:1.

Ms. Roe also told the police that after she discovered she had herpes, she believed it was from Mr. Doe because she had not "been" with anyone else since "her last physical in August." However, if you compare this to her statement in ROA.1593, she says there that she has "only hooked up with two people in the last six months."

Roe also told the police in her statement that in the beginning, when she and Doe first started dating, she asked him about a rumor that he had chlamydia and he told her no, he was clean. ROA.1458:5—11. When interviewed by Ms. Garza, Roe yet again changed her story and said that Mr. Doe told Ms. Roe before they slept together that he had contracted chlamydia. ROA.1459:8—15. Roe also admits in

her statement ROA.1582-1583 that Doe told her that he had chlamydia previously. ROA.1460:8—15.

Roe also told the police in her report that every six months she was getting a physical exam and tests to assure she was clean of STD's. ROA.1463:6—12. This was another lie by Ms. Roe, known to Ms. Garza. ROA.1464:5—7, 1465:3—20.

ROA.1582-1583 is Ms. Roe's "Official Statement" to the student judicial program against Doe. In this statement Roe states "I did not specifically ask about herpes but asked him in general if he had anything."

Ms. Roe also said in the statement "[t]hat night, when he had my pants off, he told me he saw bumps on my vagina and advised going to get it checked out tomorrow. That night he refused to have sex with me because of the scabs he saw." This is yet another statement by Roe that was a lie. ROA.1461:3—19.

ROA.1617-1619 is a "rebuttal" by Ms. Roe to Doe's statement. Once again, Ms. Roe reverses course on what information she got from Doe and says "he did not tell me that he had herpes until now, on December 14th. Therefore, his claim that he clearly told me about his disease early on in the relationship is false." Ms. Garza herself acknowledges that Roe is once again being inconsistent and "doing two different things at one time in this statement." ROA.1521:3—10.

ROA.1622-1623 is an email from Roe to various Rice University officials during the appeal process in which Ms. Roe responded to Mr. Doe putting the school

on notice that Ms. Roe had told others that it was her intention to keep her infection a secret and not tell her sexual partners. In response, Ms. Roe stated "I have talked with multiple doctors who have confirmed that many people use protection without necessarily explaining their condition in cases that may be uncomfortable to do so."

As is clear from the facts in the record, Roe repeatedly changed her story about whether Doe told her he had herpes in high school, she made misrepresentations to the police and repeatedly to the university about whether Doe told her had herpes before they slept together, about whether she had sex with Doe after she discovered scabs on her vagina, that she had been getting screened for herpes the prior summer, whether she had other sexual partners during the time she was having sex with Doe, and whether she even asked Doe about herpes. She claimed that after she was diagnosed, she spoke with "multiple" doctors who told her that as long as she used protection, she didn't have to tell her sex partners she had herpes. Not only is this not the least bit credible (since herpes can be spread even when using a condom), it announced her intent to withhold information herself in a manner that was the very basis for her claim—and criminal charges—against Doe.

ii.    The procedural flaws involved in the university's "investigation" are substantial:

Ms. Garza acknowledged that her investigation must be impartial, fair to both sides, thorough, assess all available evidence, required interviewing all witnesses, reviewing all documents, objective weighing of the evidence, and applying a burden of proof. ROA.1424:5—1427:10    Ignoring relevant information or important information could show bias on the part of the investigator. ROA.1428:6—9. It is important for both sides to have an equal opportunity to present their case. ROA.1428:10—13.

Ms. Garza agreed that assessing credibility is an important part of her investigation. ROA.1431:4—21. The investigator has to look for inconsistencies. ROA.1431:4-21. If a student's story changes, goes back and forth, that could be an indication of lack of truthfulness. ROA.1431:4-21. If the complaining student is not being truthful, that should call into question their complaint. ROA.1431:4-21. Ms. Garza acknowledged that if she has a male and a female involved in a complaint of sexual misconduct, forgiving the female's inconsistencies more easily than the male's would violate the University's gender discrimination policies. ROA.1432:4—19. Ms. Garza agreed that if she was biased in favor of the female, it would violate the University's gender discrimination policies. ROA.1432:4—19.

Ms. Garza's investigation file does not reflect any research or investigation into the herpes disease. ROA.1439:13—17. She admitted, however, that wearing a condom is not going to prevent the transmission of herpes if the students are engaged

36

in oral sex. ROA.1441:19—22. She also admitted that she was informed that the type of herpes Ms. Roe had (HV-1) could present as a cold sore. ROA.1500:10—14. When Roe presented the lab results for HV-1, Ms. Garza did not ask Roe how she was tested or how it was determined to be genital. ROA.1501:10—1503:17. She understands that HV-1 can be a simple cold sore. ROA.1502:6—9. She did not ask Roe if she had ever had a cold sore or had sex with anyone who had a cold sore. ROA.1503:8—20. Ms. Garza testified "I'm not a doctor, and so I'm not gonna get into the ins and—ins and outs of how HSV-1 is transmitted orally or genitally." ROA.1501:24—1506:1. She did not feel the need to educate herself about that before making the findings against Doe. ROA.1506:2—8. When asked whether a student with a cold sore would have to inform their partners that they had HSV-1, that it was a permanent and lifelong condition that could be transmitted to sexual partners, Ms. Garza did not know if such would violate the Student Code of Conduct. ROA 1510:1-19.

Even after testifying that credibility of the complainant was important, Ms. Garza testified that it did not matter to her whether or not Ms. Roe was lying about where she got herpes. ROA.1444:8—11. She alleged that allowing the female to lie about where/how she contracted herpes did not show any bias on her part. ROA.1444:12—16. The fact that Roe lied about Doe being the only person she slept with and then changed her story was "not relevant to the decision in the case."

37

ROA.1445:2—11.  Garza acknowledged repeatedly that Roe's story changed a number of times:

Q:    So when—I'm a little unclear where we ended up on this issue because Ms. [Roe] changed her story a number of times about whether he [Mr. Doe] told her that he had herpes in high school, didn't she?

A:    Yes

ROA.1445:12—17 (see also ROA 1521:3-10 where Ms. Garza acknowledged more inconsistencies by Ms. Roe concerning this issue).

Ms. Garza was aware that Roe also told the police in a report that every six months she was getting a physical exam and tests to assure she is clean of STD's. ROA.1463:6—12.  This was another lie by Ms. Roe, known to Ms. Garza. ROA.1464:5—7, 1465:3—20.  Ms. Garza has never seen any test result of any test on Ms. Roe saying she did not have an STD.  ROA.1464:1—4.  In fact, she never even asked Ms. Roe to see the alleged STD screens.  ROA.1466:1—3.   It is noteworthy that Ms. Garza attributed total innocence to Roe about the attributes of herpes and never wondered why Ms. Roe claimed to be getting screened for it before she even slept with Doe. ROA.1469:2—10.

ROA.1581 is a written "addendum" to Roe's statement, in which she clarified that she has "slept with a good amount of people here at Rice throughout my three years."  She also said that "[Doe] was not the first person I had unprotected sex with."  Ms. Garza did not ask Ms. Roe how many other students she had unprotected sex with, did not ask for any names, took no steps to interview any other students

38

and did not even consider interviewing the other student that Ms. Roe was sleeping with at the same time she was sleeping with Doe. ROA.1471:3—19.

Ms. Garza found that Doe violated the Student Code of Conduct, Section IIB1a.

Notably, Ms. Garza was not alleging that Mr. Doe withheld information that he was aware of. ROA.1508:23—1510:14. Yet her decision was that Doe had an obligation "to inform his partner that he had a sexually transmitted disease that could be passed along to another partner if he had unprotected sex with them." ROA.1511:3—14. This, despite the fact that Ms. Garza admits that herpes can be transmitted even when protections are used. ROA 1441:19-22. Furthermore, there is no coherent answer as to how Doe would be expected to "inform" someone of something of which he was not aware. ROA.1510:19—1511:2. Doe stated in his text to Roe that he did not know what "dormant" meant. ROA 1585-1592. He also explains in his affidavit, an exhibit, that he did not understand that it could lie dormant and still be contagious. ROA.1636. Doe, who the university admits was forthcoming, stated specifically that he told Roe about his herpes during their relationship and that he "was very upfront with her and told her what [he] knew about the situation." ROA.1613. He also stated to the university: "I definitely have not had any outbreaks or symptoms since the incident in high school with the burning

39

when I urinated.  I would never have exposed anyone if I thought I could spread the disease." ROA.1511-1514.

Ms. Garza agreed that forgiving the female's inconsistencies more easily than a male's would violate the university's gender discrimination policies. ROA.1432:4-19.  She admits that there weren't any misrepresentation made by Mr. Doe during the investigation.  ROA.1519:6—25.  She admits that at least two of the things that Ms. Doe was forthcoming about, Ms. Roe misrepresented. ROA.1520:8—15.  The only evidence was that Doe did not understand that herpes remained dormant, he did inform Ms. Roe that he had contracted it in high school, and he told her what he knew about his situation.  There was no credible evidence to counter any of those facts and yet the university found him guilty of failing to adequately notify Roe of the fact that she was at risk of contracting HSV-1 from Doe if they engaged in sexual intercourse.  ROA.1620.

Relying solely on Doe's "yes" response in the text message is misleading and without context.  As Doe explained in his response to the university's charge, at the time that Roe was texting the accusatory text to him, Doe was busy with his mother, caught by surprise and simply trying to appease her and not be confrontational. ROA.574, 1626, 1636.  Furthermore, Roe begins the very same text thread by admitting that Doe had told her he had a "run in" with herpes in high school. ROA.1624, 1615.  Ms. Garza admits that Roe told her Doe had informed Roe he had

40

herpes in high school. The following is an excerpt from Garza's letter to Doe: "[Roe] also told me that she recalls at one point in your relationship there was a conversation about you having an outbreak of herpes. She told me that she believes you told her that it happened in high school." ROA.1609.

iii.    The evidence of bias is also very substantial.

As stated above, Roe was known to have made repeated misrepresentations during the investigation and Doe made none-yet the university made assumptions in Roe's favor and against Doe (such as assuming some level of knowledge about herpes on his part for which there was no evidence).

Ms. Garza acknowledged that if Ms. Roe was also a carrier of an STD that could be transmitted through sexual intercourse and she was aware of that, she would be obligated to inform Mr. Doe. ROA.1482:25—1483:11. Doe told Ms. Garza that he had information and belief that Roe had herpes before she ever met Doe, even supplying the name of a witness to verify such. ROA.1483:12—25. Ms. Garza made the conscious decision not to talk to the witness. ROA.1483:19-24. Because Roe denied she had been a carrier of an STD, Ms. Garza took her at her word and did not bother to interview Doe' witness. ROA.1484:1—1485:21. When asked whether, in order to fair and balanced, she would need to investigate the behavior of both Ms. Roe and Mr. Doe, Ms. Garza stated that she did not investigate Ms. Roe's behavior because she did not "have a report about [Ms. Roe] not upholding her

41

obligation" under the circumstances. ROA.1485:21—1486:1. When asked whether that was something Mr. Doe asked her to do, Ms. Garza said "no." ROA.1485:21—1486:4. However, if you look at Doe' written statement (ROA.1613-1616), Doe states that Ms. Roe gave another student herpes before she slept with Doe. He provided the name of the other student that Ms. Roe gave herpes to (before she slept with Doe) and said that student had given permission for the university to speak to him. ROA.1614. Here is a written complaint about Ms. Roe's behavior in failing to reveal to Mr. Doe her condition and Ms. Garza stated that she did not need to investigate it. ROA.1487:13—1489:1.

ROA.1622-1623 is an email from Ms. Roe to various Rice University officials during the appeal process in which Ms. Roe responded to Mr. Doe's complaint that Ms. Roe had told others that it was her intention to keep her infection a secret and not tell her sexual partners. In response, Roe stated "I have talked with multiple doctors who have confirmed that many people use protection without necessarily explaining their condition in cases that may be uncomfortable to do so." Here is a stated complaint by Doe about the intent by Ms. Roe to have sexual intercourse with Rice students without informing them that she had contracted herpes. Ms. Garza testified that she had no ability to determine whether Ms. Roe's stated intent violated the Student Code of Conduct. ROA.1540:8-1541:2 and it was not even discussed or addressed by the university officials in receipt of the email. ROA.1532:8-20. The

42

university's argument that it must ignore Roe's stated intent to withhold her STD information from future partners because it was not part of a formal complaint (despite the fact that Doe complained in writing), must be compared with how the university treated Mr. Doe. Ms. Garza claimed they assessed "[w]hat penalties would allow [Doe] to continue to pursue his education at Rice while protecting the reporting student in this case and the greater community." ROA.1543:21—25 (emphasis added). The "greater community" being "everybody else that is a student that lives—or that lives or attends Rice University." ROA.1544:1—3. However, no other students had complained about Mr. Doe. ROA.1544:4—6. So even though no other students had complained about Doe, they felt free to protect those students, yet when Ms. Roe directly threatened to sleep with Rice students and not tell them she had herpes, they were unwilling to protect those students. ROA.1544:19—1545:22.

Notably, when Mr. Ostdiek was asked about Roe's expression of intent to sleep around with Rice University students and not inform her partners she had herpes, he said he would want her "counseled" because "this is a very troubling time with a lot of life-changing decisions she has to make." ROA 1553:3-1555:7. There can be no clearer evidence of bias than saying that Roe (for arguably worse conduct that Doe) would be "counseled" while Doe would be punished.

Doe was punished for allegedly violating the Student Code of Conduct. The Code of Conduct also makes it a violation for failing to be honest (ROA.1552:4-6) and for giving false information during an investigation (ROA.1552:7-11). As outlined above, the university admittedly knew that Ms. Roe was repeatedly dishonest during the investigation, yet she received no discipline for her blatant violations.

Ms. Garza blames Doe for not educating himself on his condition but determined that Roe had no responsibility to educate herself on the condition that she was informed about before choosing to have sexual intercourse. ROA.1473:10-14, 1474:10-16, 1490:19-22, 1532:4-7. Garza acknowledged that Roe could have chosen to abstain, to get more information, or to require Doe to get tested and Roe did none of those things, yet Garza did not hold Roe accountable at all. ROA.1527:2-1529:2.

iv.    Suspension:

ROA.1608-1611 sent by email at 2:06 pm is the Notice of Disciplinary Charge prepared by Ms. Garza against Doe. He is charged with "DATING VIOLENCE."

On page, 2, third paragraph, Ms. Garza stated "[Ms. Roe] also told me that she recalls at one point in your relationship there was a conversation about having an outbreak of herpes. She told me that she believes you told her it happened in high school." (emphasis added). Ms. Garza had at this time the university police report

and Ms. Roe's statement—all of which directly contradict what Roe told Ms. Garza as reflected above. ROA.1455:2—12. Even with those documents in hand, Ms. Garza did not ask Roe about the glaring and obvious inconsistencies of her story before creating a disciplinary Charge against Doe. ROA.1455:2—1456:1.

The district court found that Doe "chose not to attend the University's SJP's February 14, 2018 meeting." Memo. Op. ROA.721 Ms. Garza sent Doe an email on February 13, 2018 at 1:44 p.m. ROA.1599. The email set a meeting for the following day, the date on which Mr. Doe was supposed to respond, and yet Doe was suspended before the meeting was even to take place. ROA.1477:3—11. Ms. Garza did not try and call Doe, did not text him, and has no idea when Mr. Doe received her email scheduling a meeting for the following day. ROA.1537:12—1538:7. She admits she cannot testify that Doe received her email and ignored it. ROA.1537:12-1538:7. The next day, after receiving Ms. Garza's email, Doe asked for an extension of the meeting date (not a cancelation), and Ms. Garza agreed that was a reasonable request. ROA.1538:8—22. Both Ms. Garza and Mr. Ostdiek acknowledge the reasonableness of Doe's request for an extension to respond, particularly in light of the fact that Ms. Roe was attempting to press criminal charges. ROA 1478:6-13, 1536:9-13, 1562:22-1563:8. Nobody with the university told Doe that it was any problem to reschedule. ROA.1564:24-1566:5. Despite the facts that Doe did not refuse to cooperate, did not refuse to meet, responded to the school's

emails, asked for and received an extension on the meeting, and acted reasonably under the circumstances, he was suspended from school, ROA.1605-1606. There is no evidence that Doe chose not to participate. ROA.1605-1606 is a letter sent by Ostdiek to Doe placing Doe on interim suspension "effective immediately." "You cannot attend class, live on campus, or be on campus for any purpose without the express permission of me, or Student Judicial Programs.".... If you are found on campus without this permission, you can expect to be removed from campus and face charges that can lead to permanent expulsion from the University." This letter from Ostdiek gave Doe, a nineteen-year-old freshman from another city, living on campus, less than twenty-four hours to pack up, leave campus and find another place to live. The consequences of putting Doe on interim suspension on 2/14/18? Mr. Doe would have to make arrangements for a different place to live and how to attend classes. ROA.1572:9—19. He would have to move out within 24 hours. ROA.1573:1—7. When asked where Doe would be able to move into under those circumstances, Mr. Ostdiek stated "[t]hat's for him to figure out." ROA.1573:5—9. Ostdiek acknowledges that kicking a student off campus without knowing whether they have a place to stay or any transportation or anywhere safe to go potentially puts that student in danger. ROA.1575:11—18.

Even though Doe's attorney timely filed the appropriate request for an appeal of the suspension, Rice waited until the appeal deadline passed and then informed

Doe that they would not accept the notice filed by his lawyer. ROA.1546:7—13.

Thus, even though his attorney had timely appealed, the university would not allow

Doe to continue with the appeal. ROA.1546:7—13. Ms. Garza could not point to

any school policy, procedure or Title IX policy or law that says a lawyer cannot

submit an appeal for a student. ROA.1546:14—17. It is very clear that Rice

intentionally waited until after the deadline passed before informing Doe and his

attorney that they would not accept the attorney's appeal of the suspension and it

was now too late for Doe to file one. ROA.1634

B. Drawing all inferences in favor of Doe, the university engaged in selective

enforcement.

In a selective enforcement claim, a plaintiff may show that "regardless of the

student's culpability, the severity of the penalty and/or the university's decision to

initiate proceedings was affected by the charged student's gender." *Plummer v.*

*University of Houston*, 860 F.3d 767, 777 (5ᵗʰ Cir. 2017). When resolving selective

enforcement claims, courts often look to the treatment of a similarly situated

opposite-gender student to determine whether a plaintiff was mistreated due to his

gender. *Doe v. Univ. of Texas Health Sci. Ctr. at Houston*, No. CV H-21-1439, 2021

WL 5882625, at *10 (S.D. Tex. Dec. 13, 2021). A university can also face Title IX

liability where the charged student (plaintiff) was innocent and wrongly found to

have committed an offense. *Plummer*, 860 F.3d at 777. In the instant case, it is

47

clear first, that Doe was innocent and second, that the university engaged in selective enforcement.

Doe incorporates herein the factual references contained in A., above. In summary of those facts recited, Ms. Garza acknowledged in her charge that Doe told Roe during their relationship that he had contracted herpes in high school and the summary judgment evidence establishes that Doe was not aware that herpes could be dormant or contagious while dormant. Doe informed Ms. Garza that Roe had done exactly what she was accusing Doe of, except worse. Before Roe and Doe had sex, Roe had unprotected sex with another student that was a friend of Doe's, did not tell him she had herpes, and transmitted the condition to the other male student. The other student was willing to come forward and make a report. Doe made his report directly to Ms. Garza but she refused to interview the other male student, refused to consider the information and refused to hold Roe accountable. Perhaps most incredibly, Roe announced in an email university officials her intent going forward not to inform her sexual partners of her herpes. Ms. Garza testified she was not capable of determining whether Roe's intent violated the student code. Garza did not tell Roe to educate herself sufficiently to inform her sexual partners. None of the email recipients at Rice discussed whether Roe posed a danger to other students, yet when assessing Doe's punishment, they considered "every other student that attends Rice University" (and who had not filed complaints). Mr.

48

Ostdiek, the person who so egregiously kicked Doe off campus knowing he had nowhere to go, said his response to Roe's intentions was that he would want Roe "counseled" because "this is a very troubling time with a lot of life-changing decisions she has to make." These are all instances of the university's selective enforcement of its policies against Doe but not Roe.

C. Drawing all inferences in favor of Doe, the university engaged in archaic assumptions.

Doe incorporates herein the factual references contained in A., above. Well-established precedent rejects archaic assumptions about the roles of men and women that are outdated, archaic and outmoded. *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 881 (5th Cir. 2000). Certainly, assuming that an adult female college junior is incapable of understanding the risks of sexual intercourse without the male educating her is part of such archaic thinking. Doe gave Roe true information. Refusing to acknowledge that Roe had any accountability for her own actions, her own choices and her own conduct is "remarkably outdated." Subsequently refusing to hold her accountable for the *same conduct* is outdated, archaic and outmoded. The point of gender equality is not just equal opportunity, it is equal accountability. Rice refused to treat Doe and Roe equally and the "remarkably outdated" mindset is amply demonstrated by Mr. Ostdiek: unsupported and incredible allegations of Roe result in immediate banishment of Doe without even soliciting a response v.

49

Roe's identical conduct would result in "counseling" "because this is a very troubling time with a lot of life-changing decisions she has to make." This is the very attitude that is such an obstacle to gender equality on all levels.

1. Breach of Contract

"Where a private college or university impliedly agrees to provide educational opportunity and confer the appropriate degree in consideration for a student's agreement to successfully complete degree requirements, abide by university guidelines, and pay tuition, a contract exists." *Southwell v. Univ. of Incarnate Word*, 974 S.W.2d 351, 356 (Tex. App. 1998). The implied contract is irrespective of whether the university's catalog/policies contain an disclaimer. *Id.* The terms are defined by the university's policies and requirements. *Id*.

Ms. Garza testified that the university's policies included not treating students differently on the basis of gender, providing fair and equal treatment to both sides during an investigation, conducting an impartial investigation with integrity, conducting a thorough investigation and reviewing/weighing all relevant evidence. Ms. Garza also testified that a Title IX claimant had the burden of proof by a preponderance of the evidence. ROA.1424:5-1428:24. Doe's suspension was supposed to be fair and just. According to Ms. Garza, Doe was entitled to those things as a part of his education at Rice. ROA.1424:5-1428:24. Doe has set forth in great factual detail in section 1, above, incorporated by reference, each way in

which the university failed to provide fair and equal treatment and all of the failings

of the investigation, as well as the fact that Doe was innocent of the charge.  Thus,

there is at least a material fact issue regarding the university's breach of its contract

with Doe.

   2.  Damages

   Doe informed the university of his damages in Plaintiff's Disclosures.  While the

university may take issue with a lack of specific calculation for economic damages,

non-economic damages are not subject to such calculation.  Plaintiff disclosed as

follows:

> For violation of Title IX of the Education Amendments of 1972 and state law
> breach of contract, Plaintiff John Doe seeks recovery for damages against
> Defendant Rice University, awarding John Doe damages in an amount to be
> determined at trial, including, without limitation, damages to physical well-
> being, emotional and psychological damages, damages to reputation, past and
> future economic losses, in excess of $1,000,000, loss of educational and career
> opportunities (including, but not limited to, the full value of Rice University
> tuition, room, and board, for the four (4) years that Doe was expected to
> attend, pursuant to Doe's scholarship award…and exemplary/ punitive
> damages, plus pre-judgment interest, attorneys' fees, expenses, costs and
> disbursements.

   There is no requirement for a "computation" of intangible damages. Case law

is clear that a plaintiff is not obligated to provide a calculation of damages sought

for mental anguish or emotional pain and suffering. *See Williams v. Trader Publ'g,

Co.*, 218 F.3d 481, 486 n.3 (5th Cir. 2000) ("Since compensatory damages for

emotional distress are necessarily vague and are generally considered a fact issue for

51

the jury, they may not be amenable to the kind of calculation disclosure contemplated by Rule 26(a)(1)(C).”). Similarly, a plaintiff is not expected to produce a calculation of punitive damages. *Burrell v. Crown Central Petroleum, Inc.*, 177 F.R.D. 376, 386-87 (E.D. Tex. 1997). See also *Fisher v. Seton Family of Hosps.*, No. 1:18-CV-1108-RP, 2020 WL 2475823, at *2 (W.D. Tex. May 13, 2020)(plaintiff not required to provide computation of emotional distress or punitive damages).

CONCLUSION

The district court failed to view the evidence presented in the light most favorable to the non-movant. When the evidence is viewed in such light, there are, at the very least, material fact issues for the jury in this case. The summary judgment should be reversed and the case remanded for trial.

Respectfully submitted,

s/Susan E. Hutchison
Susan E. Hutchison
Texas Bar No. 10354100
sehservice@hsjustice.com

HUTCHISON & STOY, PLLC
500 East 4th St., Ste. 100
Fort Worth, TX 76102
(817) 336-5533
817.887.5471 fax

ATTORNEYS FOR APPELLANT

CERTIFICATE OF SERVICE

This is to certify that on this January 13, 2022, a true and correct copy of the above and foregoing document was served on the following attorney of record via the court's electronic service:

Counsel for Appellee:
Emily McLemore Smith
Rusty Hardin
Rusty Hardin & Associates

s/Susan E. Hutchison
Susan E. Hutchison

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

I certify that the foregoing Brief of Appellant complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,752 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

I certify that the foregoing Brief for Appellant complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for MAC in 14 point Times New Roman.

/s/Susan E. Hutchison
Susan E. Hutchison